**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MARK JACKSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-1475 (RC) |
| | : | | |
| v. | : | Re Document No.: | 45 |
| | : | | |
| DISTRICT OF COLUMBIA, et al., | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANT GLENN LOMBARDINI'S MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Plaintiff Mark Jackson sued Officer Glenn Lombardini and the District of Columbia under 42 U.S.C. § 1983 and various common law tort theories for injuries arising from two mid-2018 arrests. Jackson conceded in response to a motion to dismiss that only his excessive force claim against Officer Lombardini remains viable. Officer Lombardini now moves for summary judgment on the theory that he is entitled to qualified immunity for his actions during each arrest. Because there was no on-point caselaw placing the unlawfulness of Officer Lombardini's actions beyond debate at the time of the arrests, the Court grants him qualified immunity.

**II. BACKGROUND**

**A. Factual Background**

This lawsuit arises from two separate arrests approximately three weeks apart. The parties agree on many of these facts, while others can be clearly discerned from body-worn camera ("BWC") and security footage. To the extent possible, the Court will "view[] the facts in the light depicted by the videotape[s]." *Scott v. Harris*, 550 U.S. 372, 381 (2007). Where issues of fact exist, the Court views them in the light most favorable to Jackson. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157 (1970)).

1. The Arrest on April 19, 2018

On April 19, 2018, Officer Lombardini was on bike patrol in eastern Washington, D.C. Defendant's Statement of Material Facts ("DSMF") ¶ 1, ECF No. 45-1; *see generally* April BWC Footage, Ex. 2 to Def.'s Mot., ECF No. 45-3. As Officer Lombardini passed a shopping center, he spotted Jackson urinating next to a large industrial dumpster, which abutted and was visible from the sidewalk. DSMF ¶¶ 2–3. Jackson turned his head to look at Officer Lombardini, waived his hand in the officer's direction, and continued urinating.[1] Surveillance Video at 16:41:21–27, Ex. 3 to Def.'s Mot., ECF No. 45-4. Officer Lombardini approached Jackson from behind and pressed him against the dumpster, causing his face to make brief contact with the dumpster. DSMF ¶ 4; April BWC Footage at 20:40:35–44; Surveillance Video at 16:41:31–36.

Officer Lombardini then instructed Jackson to "Put your hands behind your back," to which Jackson responded, "For what?"[2] April BWC Footage at 20:41:19–22. Officer Lombardini explained, "'cause I said so," and placed Jackson's right hand behind his back. *Id.* at 20:41:22–29. He then grabbed Jackson's left hand and placed it behind Jackson's back, as well, stating, "Put your hands behind your back, that's all I'm asking you." *Id.* at 20:41:29–34.

---

[1] Plaintiff asserts that he suffers from prostate cancer that "makes it very difficult for him to stop urinating once started." Compl. ¶ 9.

[2] The parties dispute whether Jackson pushed away from the dumpster as Officer Lombardini attempted to place him in handcuffs, and the BWC does not clearly indicate one way or the other. *See* DSMF ¶ 5; Pl.'s Res. to DSMF ¶ 5, ECF No. 48-2. The video also does not clearly indicate the degree to which Jackson may have physically resisted Officer Lombardini's attempts to move his arms to apply handcuffs up until the moment when he pulled his left hand away, as discussed below. At this stage, the Court views these facts in the light most favorable to Jackson.

Officer Lombardini then pushed on Jackson's upper back, repeatedly telling him to "lean forward." *Id.* at 20:41:29–34. Jackson told Officer Lombardini, "Stop pushing my face though man. You got one more second to push me and I'm gonna get you f***ed. I swear to God on my grandmother's grave that you got one more time to push me." *Id.* at 20:41:38–51. After Officer Lombardini ordered a bystander to back up, *id.* at 20:41:49–55, he again instructed Jackson to "Lean forward so I can put the cuffs on you," *id.* at 20:42:00–02.

At this point, Officer Lombardini's BWC was pushed up against Jackson's coat, and the events are not fully visible. It is clear, however, that Jackson pulled his left arm out of Officer Lombardini's hand, *id.* at 20:42:05–06, and said, "I ought to knock you out. That's what I should do," *id.* at 20:42:09–12. Officer Lombardini was still the lone officer on scene at this time. DSMF ¶ 10. Officer Lombardini responded, "Now you are going for threatening as well." April BWC Footage at 20:42:12–16. He tackled Jackson to the ground, placing his knee on Jackson's upper back for a few seconds.[3] *Id.* at 20:42:16–19. Another officer arrived and assisted Officer Lombardini to place Jackson into handcuffs. *Id.* at 20:42:22–40.[4] The officers applied no additional force and soon helped Jackson to his feet. *Id.* at 20:42:53–56. In total, Jackson spent approximately 30 seconds on the ground. *Id.* at 20:42:19–55. The arrest report states that Jackson was placed under arrest for urinating in public, threats to do bodily harm, and

---

[3] Jackson claims in the Complaint that Officer Lombardini held him on the ground "until Plaintiff could no longer breath[e]." Compl. ¶ 11. Jackson does not include this in his statement of material facts, ECF No. 48-3, and the BWC shows that he was able to speak in a normal, unstrained voice throughout the time he was on the ground. *See* April BWC Footage at 20:42:19–55.

[4] Jackson alleges that he suffered "a fracture to his jaw, hearing loss in his right ear, back sprain, and a scrotum contusion," Compl. ¶ 13, although he presents no evidence of these injuries at summary judgment. Although Jackson complained in the BWC footage of a bloody lip, he did not complain of an injury to his jaw. *See* April BWC Footage at 20:42:58.

resisting arrest.  April Arrest Report at 3, ECF No. 45-2.  It additionally states that Jackson was treated by first responders and transported to Howard Hospital.  *Id.*

### 2.  The Arrest on May 8, 2018

On May 8, 2018, Officer Lombardini was again on bike patrol when he approached a building, where he observed what he believed to be an open beer can in a plastic bag Jackson was holding.  DSMF ¶¶ 16–18.  Officer Lombardini instructed Jackson to remove the item from the bag, which turned out to be a bottle of vodka.  *Id.* ¶ 20.  Jackson passed the bottle to another person, who then walked away.  *Id.* ¶¶ 19–21.  Officer Lombardini held onto the back of Jackson's shirt and walked him to a set of stairs at the apartment building.  *Id.* ¶ 22.  Jackson objected that he had not been drinking.  May 8 BWC, Ex. 4 to Def.'s Mot. at 21:39:18–52, ECF No. 45-5.

After a verbal exchange, Officer Lombardini decided to arrest Jackson, telling him multiple times to turn around, but Jackson refused to do so.[5]  DSMF ¶ 23.  Jackson said, "this your second time" and repeated "don't touch me."  May 8 BWC at 21:40:27–35.  Officer Lombardini then pushed Jackson into the stair railing, which Jackson grabbed on to.  *Id.* at 21:40:41–52.  He instructed Jackson to "let go of the pole."  *Id.* at 21:40:51–53.  The officer cuffed Jackson's left wrist and pulled it behind his back.  *Id.* at 21:40:55–21:41:02.  He instructed Jackson, "put your other hand behind your back," and pushed Jackson against a brick wall before eventually cuffing his right wrist, as well.  *Id.* at 21:41:01–28.  When Officer Lombardini forced Jackson's arm behind his back, Jackson's elbow was dislocated.  DSMF ¶ 30.

---

[5] The parties dispute whether Jackson clenched his fists or made a physical gesture as if he was going to strike Officer Lombardini.  DSMF ¶ 24; Pl.'s Resp. to DSMF ¶ 24.  The BWC does not clearly resolve this controversy, so the Court construes the facts in the light most favorable to Jackson.

Officer Lombardini then sat Jackson on the steps, and other officers arrived.  May 8 BWC at 21:41:31–34.  The arrest report states that Jackson was placed under arrest for possession of an open container and resisting arrest, and that he was transported to a hospital for treatment.  May Arrest Report at 3, ECF No. 45-6.

### B.  Procedural Background

On April 5, 2021, Jackson filed a civil complaint against Officer Lombardini and the District of Columbia in the Superior Court.  *See* Compl.  He asserted excessive force claims under 42 U.S.C. § 1983 against Officer Lombardini in his official and individual capacities, as well as against the District of Columbia.  Compl. ¶¶ 24–33.  He also asserted common law claims of intentional infliction of emotional distress, negligent supervision, negligent training, and general negligence for which the District of Columbia was liable under a theory of respondeat superior.  Compl. ¶¶ 34–62.  The District removed the case to this Court.  *See* Notice of Removal ¶ 3, ECF No. 1.  On June 28, 2021, Officer Lombardini and the District moved to dismiss all claims other than the § 1983 claim against Officer Lombardini in his individual capacity.  ECF No. 7.  On March 21, 2022, Jackson conceded the arguments raised in the motion and agreed that those claims should be dismissed.  ECF No. 28.  As such, only the § 1983 excessive force claim against Officer Lombardini in his individual capacity remains.

Officer Lombardini now moves for summary judgment based on qualified immunity.  *See generally* Def.'s Mot. Summ. J., ECF No. 45.  Jackson opposes this motion, ECF No. 48, and following Officer Lombardini's reply, ECF No. 50, the Court is ready to rule.

### III.  LEGAL STANDARD

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

5

R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *Anderson*, 477 U.S. at 248.  A dispute is "genuine" if sufficient evidence exists such that a reasonable factfinder could return a verdict for the nonmoving party.  *Id.*; *see Scott*, 550 U.S. at 380.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact.  *Id.* at 323; Fed. R. Civ. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials").  In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine issue that is suitable for trial.  *Celotex*, 477 U.S. at 324.  On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255.  Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**IV.  ANALYSIS**

The Court first reviews the legal principles underlying qualified immunity.  The Court next examines the April 19, 2018, arrest, separately considering Officer Lombardini's actions before and after the takedown maneuver.  Finally, the Court addresses the May 8, 2018, arrest.

6

### A. Qualified Immunity

Qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). It accomplishes this by shielding federal and state officials from money damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

For a right to be "clearly established" at the time of the official's conduct, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *al-Kidd*, 563 U.S. at 741). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 63. "The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Id.* (first quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); then quoting *al-Kidd*, 563 U.S. at 741–42).

This "standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* The rule demands "a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 577 U.S. at 13). It is not satisfied by caselaw that "lay[s] out . . . principles at only a general level." *White*, 580 U.S. at 79. This means that to proceed past qualified immunity, the Court must "identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the" plaintiff's constitutional rights. *Id*. The plaintiff bears the burden of showing "that the particular right in question—

7

narrowly described to fit the factual pattern confronting the [officials]—was clearly established." *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (citation omitted).

In addition, trial courts have discretion to decide which prong of the two-prong qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Rasul v. Myers*, 563 F.3d 527, 530 (D.C. Cir. 2009) ("[L]ower federal courts have the discretion to decide only the more narrow 'clearly established' issue 'in light of the circumstances of the particular case at hand.'" (quoting *Pearson*, 555 U.S. at 236)). As the parties here debate only whether Officer Lombardini is entitled to qualified immunity, the Court does not reach whether "the official violated a statutory or constitutional right." *al–Kidd*, 563 U.S. at 735.

### B. Qualified Immunity for Using Force to Arrest Jackson on April 19, 2018

Jackson asserts that "Defendant Lombardini" committed excessive force when he "slammed Plaintiff face first into the dumpster and ordered him to put his hands up against the dumpster." Compl. ¶ 9. Officer Lombardini then "twisted Plaintiff's right arm and elbow behind his back, and then his left arm and elbow." *Id.* ¶ 11. After that, he "slammed Plaintiff to the ground." *Id.* Officer Lombardini responds that he is entitled to qualified immunity for his use of force to arrest Jackson. Def.'s Mot. at 13–14. The Court separates Officer Lombardini's conduct into two parts, first considering his actions during the initial arrest before focusing on the takedown maneuver he performed.

"In assessing a claim of excessive force, courts ask 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" *Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 466 (2021) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless

existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix*, 584 U.S. at 13). "Even if there is a genuine dispute about the reasonableness of an officer's use of force, he is protected by qualified immunity unless his force violated clearly established law." *Hedgpeth v. Rahim*, 893 F.3d 802, 809 (D.C. Cir. 2018).

1. Initial Arrest

The Court starts by considering Officer Lombardini's actions prior to using a takedown maneuver. The video evidence does not support Jackson's assertion that Officer Lombardini "slammed" him into the dumpster, as he claims. Compl. ¶ 9. The surveillance camera footage depicts the officer pushing Jackson against the dumpster while initially seizing him. Surveillance Video at 16:41:35–41. His face briefly made contact with the dumpster, which appeared to be clean, and Jackson claims no injuries as a result of this contact. *Id.* at 16:41:36; April BWC Footage at 20:40:44. When attempting to place Jackson in handcuffs, Officer Lombardini again pushed Jackson's body, as well as his face, against the dumpster. April BWC Footage at 20:41:37–42. The video evidence thus shows that Officer Lombardini pushed Jackson against the dumpster, rather than a more forceful "slam."

Even under the facts alleged, which included Officer Lombardini slamming Jackson against the dumpster and then twisting his arms behind his back, it is Jackson's burden to show that the unconstitutionality of Officer Lombardini's actions was "beyond debate." *Dukore*, 799 F.3d at 1144–45 (quoting *al-Kidd*, 563 U.S. at 741). He cites cases from the Fourth Circuit rather than any within the D.C. Circuit, Pl.'s Opp'n Mot. at 5–8, and thus fails to point to "'controlling authority' or 'a robust consensus of cases of persuasive authority'" on this issue. *Wesby*, 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741–42). The facts of these cases are more relevant to Officer Lombardini's takedown and are discussed further below. The Court's own

review of the relevant caselaw reveals no controlling precedent indicating that the fact pattern here violates an arrestee's constitutional rights. To the extent that controlling authority from the D.C. Circuit speaks to the circumstances Officer Lombardini faced when he initially seized Jackson and pushed him up against the dumpster, that precedent in fact points toward the constitutionality of his actions.

In *Oberwetter v. Hilliard*, a group began dancing at the Jefferson Memorial and was ordered to disperse by the United States Park Police. 639 F.3d 545, 548 (D.C. Cir. 2011). When one dancer did not leave the area, an officer arrested her, "ripping apart her earbud, shoving her against a pillar, and violently twisting her arm." *Id.* The D.C. Circuit concluded that the officer did not use excessive force because he was "reasonably worried that events might get out of hand" and "some force may have appeared reasonably necessary, [the officer's] alleged actions were not markedly different from what we would expect in the course of a routine arrest." *Id.* at 555. The Court additionally observed that the officer did not cause her "any serious bodily injury," "confirm[ing] that the use of force was not excessive." *Id.*

In *Lin v. District of Columbia*, an individual called the police after another person assaulted her.[6] 47 F.4th 828, 835 (D.C. Cir. 2022). The responding officers mistakenly believed that the caller was the suspect, and officers "yanked" her out of a chair and "pushed her against the wall." *Id.* Two more officers arrived, and "[t]he four officers forced [the caller] onto the floor and handcuffed her as [she] cried out." *Id.* The caller was later released. *Id.* at 836. The D.C. Circuit observed that the officers' actions did not severely injure the caller and that "law enforcement officers may use 'some degree of physical coercion' or threat thereof in making an

---

[6] Although the D.C. Circuit issued *Lin* after the events at issue in this case, the opinion demonstrates the lack of clear contrary precedent prohibiting officers from pushing an arrestee against a wall or similar object during an arrest.

arrest." *Id.* at 847 (quoting *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009)). The court concluded that "a reasonable jury could not find that the officers used excessive force in arresting" the caller. *Id.*

These cases suggest that when an officer pushes an arrestee into a wall, pillar, or similar object during the course of a routine arrest, in a manner that does not cause injury, the officer does not engage in excessive force. *See Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (differentiating "pushing an arrestee against a wall and pulling his arm behind his back" from "beating a suspect to the ground with a baton" when considering excessive force claim (quoting *Oberwetter*, 639 F.3d at 555)); *Steele v. Dist. Colum. Hous. Auth.*, No. 02-cv-1420, 2006 WL 335770, at *7 (D.D.C. Feb. 14, 2006) (observing that "push[ing]" the plaintiff "against the wall while making the arrest . . . represent[ed] a typical maneuver in an arrest situation, as police officers routinely push suspects against the wall when placing handcuffs on them"). In addition, the D.C. Circuit held in *Oberwetter* that an officer did not commit excessive force when "shoving" an arrestee "against a pillar, and violently twisting her arm" following the relatively minor offense of dancing and failing to disperse. 639 F.3d at 548.

To be sure, there is at least some precedent in this universe of caselaw pointing in the other direction. *See Hall v. District of Columbia*, 867 F.3d 138, 157 (D.C. Cir. 2017) (finding excessive force where police "threw [p]laintiff up against the bathroom wall," "dragged [p]laintiff out of the [bar]," and "tighten[ed] the handcuffs on [p]laintiff's wrists" after a restaurant falsely reported she had not paid her bill). Yet to the extent that the relevant rule may be "beyond debate," *Wesby*, 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741), it would tend towards the constitutionality of Officer Lombardini's initial actions here, not toward unconstitutionality. The law is also not "clear enough that every reasonable official would

11

interpret it to establish" that an officer may not push an individual up against an object during the course of an arrest for public urination. *Id.* at 63.  Officer Lombardini is thus entitled to qualified immunity for his conduct leading up to the takedown maneuver.

### 2.  Takedown Maneuver

The Court next considers whether Officer Lombardini is entitled to qualified immunity for his takedown maneuver bringing Jackson to the ground.  As a reminder, Officer Lombardini took this more aggressive action after Jackson pulled his left arm away from the officer during the application of handcuffs and threatened to "knock [him] out."  April BWC Footage at 20:42:05–12.  Officer Lombardini was also alone at this time, and he pinned Jackson to the ground to apply handcuffs.  *Id*. at 20:42:15–20.  After placing Jackson in handcuffs, Officer Lombardini applied no additional force and assisted Jackson to his feet.  *Id*. at 20:42:48–55.  Jackson argues that the takedown constituted excessive force.  Pl.'s Opp'n Mot. at 6.  Officer Lombardini contends that he is entitled to qualified immunity for tackling Jackson to the ground.  Def.'s Mot. at 13–14.

As previously noted, Jackson cites caselaw from the Fourth Circuit that does not control with respect to officers' actions in this district.  Pl.'s Opp'n Mot. at 5–8.  In addition, these cases evaluated factual circumstances unlike those Officer Lombardini faced here.  *Valladares v. Cordero* concerned an officer who tackled and broke the jaw of an arrestee after he surrendered, where the individual did not represent a threat.  552 F.3d 384, 390 (4th Cir. 2009).  Here, in contrast, Jackson had just pulled his hand away from the officer and threatened to strike him.  April BWC Footage at 20:42:05–12.  *Rowland v. Perry* involved a mentally handicapped individual who picked up a five dollar bill the officer suspected did not belong to him, after which the officer seized him, punched him, threw him to the ground and tore a ligament in his

leg, permanently disabling him. 41 F.3d 167, 171–72 (4th Cir. 1994). *Rowland* does not overlap factually with the instant case. *Lewis v. Caraballo*, which was decided after the events at issue here, considered an officer who struck an arrestee in the shoulder, kneed him in the head and chest, and then punched the individual in the head five times. 98 F.4th 521, 526–27 (4th Cir. 2024). The arrestee there was backing away from the officers involved and did not represent an immediate threat to them. *Id.* at 526, 532. That case could not have provided guidance to Officer Lombardini in April 2018 and clearly involved greater force than that used by Officer Lombardini.

      *Pegg v. Herrnberger*, cited by Jackson, *see* Pl.'s Opp'n Mot. at 8, in fact supports qualified immunity in the specific facts of this case. 845 F.3d 112 (4th Cir. 2017). There, officers ordered an individual out of his vehicle, and when he "pulled his right arm away from the trooper" and resisted arrest, they "took [the arrestee] to the ground," and "pinned [him] there" for "less than forty seconds" before bringing him back to his feet. *Id.* at 116. The Fourth Circuit concluded that the officer's "actions were objectively reasonable and he is entitled to qualified immunity as a result." *Id.* at 120. The case tends to demonstrate that it was not beyond debate that an officer violates the Fourth Amendment by conducting a takedown maneuver after an individual pulls his arm away and threatens the officer during an arrest.

      Caselaw within the D.C. Circuit, which controls here, again tilts against the rule Jackson would apply in this case. In *Scott v. District of Columbia*, officers tackled an individual who attempted to exit a police cruiser after they believed he had been arrested for driving under the influence. 101 F.3d 748, 752–54 (D.C. Cir. 1996). The officers "struck" the arrestee, "grabbed" him, and "'slammed' him to the ground" before rolling him over, applying handcuffs, and "'dragg[ing]' him to a police transport vehicle." *Id.* at 759. The court concluded that the

defendant officers were "entitled to use reasonable force to prevent [the individual] from escaping" and that the officers did not engage in excessive force when they "knocked him to the ground, rolled him over, and pinned him with their knees so that he could be handcuffed." *Id.* The situation the officers faced in *Scott* is similar to that of Officer Lombardini here—an individual resisted arrest, the officer tackled him to the ground and pinned him to apply handcuffs, and then the officer applied no further force. *See also Cromartie v. District of Columbia*, 479 F. App'x 355, 357 (D.C. Cir. 2012) (affirming lack of excessive force where individual who resisted arrest "was slammed to the ground, handcuffed, and forcibly kept on the ground by one or both officers").

The D.C. Circuit again considered the issue of takedowns in *Hedgpeth v. Rahim*, this time affirming the grant of qualified immunity. 893 F.3d at 811. There, officers attempted to arrest an individual they suspected had been hitting passersby on the street. *Id.* at 805. The arrestee began screaming and refused to place his hands behind his back, so an officer "used his knee to push the back of [the individual's] leg and take him down to the ground." *Id.* As he fell, "his head struck the grid of the paned window of [a] bar," and he suffered injuries including a concussion, headaches, and vertigo. *Id.* The court concluded that in light of its prior decisions, it was "unable to conclude that [the officer] violated clearly established law in using a takedown maneuver to subdue [the arrestee] in the circumstances present here." *Id.* at 810. The court observed that the "case is comparable to our prior decisions in that it involves a person who exhibited belligerent and erratic behavior . . . who shouted at officers in an increasingly agitated fashion, and who repeatedly refused the officers' orders." *Id.* The court thus upheld the grant of qualified immunity to the officer. *Id.* at 811.

It is understood in this Circuit "that the use of takedowns is generally lawful when a suspect is resisting arrest." *Cooper v. District of Columbia*, 548 F. Supp. 3d 170, 181 (D.D.C. 2021) (citing *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 66 (D.D.C. 2018)); *see also Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 88 (D.D.C. 2015) (similar); *Armbruster v. Frost*, 962 F. Supp. 2d 105, 114 (D.D.C. 2013) (similar). "Police officers have authority to use 'some degree of physical coercion' when arresting a suspect," particularly when an arrestee "refus[es] to obey" an officer's order. *Wasserman,* 557 F.3d at 641 (quoting *Graham,* 490 U.S. at 396). In addition, the relevant caselaw does not indicate that an officer categorically may not employ a takedown maneuver during an arrest for a minor offense, but rather ties its propriety to the arrestee's conduct during the arrest. *See, e.g.*, *Scott v. District of Columbia*, 101 F.3d at 759 (discussing officers' belief that an individual arrested for driving under the influence was fleeing); *Hedgpeth*, 893 F.3d at 810–11 (describing arrestee's interactions with police during arrest); *Pegg*, 845 F.3d at 120 ("Though [the arrestee's] crime was not severe, he admits that he resisted arrest."). Courts in this district regularly grant qualified immunity to officers who conduct takedowns to subdue individuals who are resisting arrest or remain a threat to others. *See Johnson v. District of Columbia*, 490 F. Supp. 3d 144, 162–63 (D.D.C. 2020); *Burney v. Suggs*, 630 F. Supp. 3d 20, 34 (D.D.C. 2022). The use of force generally crosses the line, however, when officers use "violence on an already subdued suspect." *Cooper*, 548 F. Supp. 3d at 181 (citing *Jackson*, 327 F. Supp. 3d at 66); *see also Hedgpeth*, 893 F.3d at 811 ("[W]e have held that an officer acted unreasonably when he kicked a suspect in the groin while the suspect lay on the ground and posed no risk of flight." (citing *Johnson*, 490 F. Supp. 3d at 165 (denying qualified immunity where issues of fact existed as to whether officer struck subdued arrestee))).

This caselaw is bereft of any clearly established, controlling precedent indicating the unlawfulness of Officer Lombardini's actions at the time of the arrest in April 2018. Officer Lombardini tackled Jackson after he made a threat and pulled his hand away while the officer was applying handcuffs. April BWC Footage at 20:42:05–22. At that time, Jackson was resisting arrest. Like the officers' actions in *Pegg* and *Scott*, Jackson was briefly pinned to the ground while handcuffs were applied and then helped to his feet with no further application of force. *See Pegg,* 845 F.3d at 166; *Scott*, 101 F.3d at 759; April BWC Footage at 20:42:16–55. The Court cannot "identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the" plaintiff's constitutional rights. *White*, 580 U.S. at 79. Because there was no clearly established Fourth Amendment right for an individual who threatens and pulls his arms away from officers to not be subject to a takedown maneuver at the time of the April 2018 arrest, Officer Lombardini is entitled to qualified immunity for his actions.[7]

### C. Qualified Immunity for Using Force to Arrest Jackson on May 8, 2018

The Court next considers whether Officer Lombardini is entitled to qualified immunity for the second arrest of Jackson on May 8. The parties agree that Jackson refused to turn around so that Officer Lombardini could effect an arrest. DSMF ¶ 23. The BWC then shows the officer

---

[7] Jackson asserts that the District of Columbia Office of Police Complaints "sustained a finding that Defendant Lombardini used excessive force against Mr. Jackson during" the April 19 arrest. Compl. ¶ 15; *see also* Pl.'s Opp'n Def.'s Mot. at 3–4. Jackson has not presented that finding to the Court. Even assuming that (1) the Office of Police Complaints based this alleged decision on the Fourth Amendment, rather than internal Metropolitan Police policies, and (2) that the decision has any controlling force here, the Supreme Court has made clear that whether "the official violated a statutory or constitutional right" and whether "the right was 'clearly established' at the time of the challenged conduct" represent separate questions. *al-Kidd*, 563 U.S. at 735 (quoting *Harlow*, 457 U.S. at 818). Even if the Court were to agree that Officer Lombardini engaged in excessive force, he would still be entitled to qualified immunity under the precedent that existed on April 19, 2018.

16

pushing Jackson up against a railing and Jackson latching onto the railing in a manner preventing application of handcuffs. May 8 BWC at 21:40:41–21:41:02. Officer Lombardini forced one handcuff onto Jackson's left hand and pushed him into an adjacent wall before applying the other handcuff to the right hand. *Id.* at 21:40:58–21:41:28. The parties agree that this resulted in dislocation of Plaintiff's right elbow. DSMF ¶ 30; May 8 BWC at 21:40:41–21:41:02. Officer Lombardini then had Jackson take a seat on the stoop and applied no further force. May 8 BWC at 21:41:29–21:41:36. Jackson claims that Officer Lombardini used excessive force during this arrest. Compl. ¶ 29. Officer Lombardini asserts that he is entitled to qualified immunity. Def.'s Mot. at 14–15. Jackson contends that the officer violated clearly established law and is not entitled to qualified immunity. Pl.'s Opp'n Def.'s Mot. at 5–9.

  The Court approaches this incident in a similar manner to the April arrest. Again, Jackson provides no caselaw from courts within this Circuit, and the Fourth Circuit cases he does include consider facts vastly different from those Officer Lombardini faced on May 8. *See id.* at 5–8. The Court finds no controlling caselaw indicating that an officer may not use force to place a resisting arrestee's hands behind his back. Indeed, the D.C. Circuit's caselaw at the time of the arrest indicated that officers may use force to gain control of a resisting individual's arms during an arrest.

  The D.C. Circuit concluded in *Martin v. Malhoyt* that an officer did not commit excessive force when he "grabbed [the arrestee's] arms[,] pulled them behind [his] back[,] and immediately placed [him] in handcuffs while pushing [him] up against [the] limousine" during a traffic stop where the arrestee did not stay in his vehicle. 830 F.2d 237, 239–40, 262 (D.C. Cir. 1987). "Tested by the standard confirmed in [*Tennessee v. Garner*, 471 U.S. 1 (1985)]," the court concluded that it was "unable to characterize the manner in which [the officer] arrested [the

17

driver] as objectively unreasonable in light of the rapidly unfolding sequence of events." *Martin*, 830 F.2d at 262 (emphasis omitted).

In *Wasserman*, an individual suspected of violating the District of Columbia's dog leash law refused to stop for a Park Police officer. 557 F.3d at 636. The officer placed her hand on the individual's shoulder, "forced" his "arm behind his back, handcuffed him, and placed him under arrest." *Id.* at 636–37. She "forcefully pressed upwards on [his] arm before handcuffing him, causing him pain." *Id.* at 641. Evaluating whether the officer engaged in excessive force, the court observed that "[p]olice officers have authority to use 'some degree of physical coercion' when arresting a suspect, and [the person's] refusal to obey [the officer's] order prior to his arrest suggested that he might try to resist or escape." *Id.* (citation omitted). The court there additionally observed that the lack of injury to the arrestee "tends to confirm that [the officer] did not use 'more force than reasonably appeared necessary.'" *Id.* (quoting *Scott*, 101 F.3d at 760).

In *Oberwetter*, too, the Park Police officer "shov[ed]" the arrestee "against a pillar" and "violently twist[ed] her arm" to effectuate the arrest after she refused to disperse. 639 F.3d at 548. Recall that the D.C. Circuit concluded the officer did not engage in excessive force, in part because the officer "did not cause" the arrestee "any serious bodily injury." *Id.* at 555. Other district courts in this Circuit have thus found no excessive force when an officer grabs an individual's arms and places them in handcuffs to effectuate an arrest or detention. *See, e.g.*, *Wood v. District of Columbia*, No. 14-cv-2066, 2017 WL 2374346, at *8 (D.D.C. May 31, 2017); *Lyles v. United States Marshalls Serv.*, 301 F. Supp. 3d 32, 43 (D.D.C. 2018). Similarly to caselaw governing takedowns, these opinions do not focus heavily on the severity of the offense, but rather the arrestee's conduct during the arrest. *See Martin*, 830 F.2d at 261–62 (finding no excessive force during traffic stop for parking violation); *Wasserman,* 557 F.3d at

636, 641 (finding no excessive force during stop for leash law violation); *Oberwetter*, 639 F.3d at 554–56 (finding no excessive force during arrest for dancing and failing to disperse).

The only aspect of the incident that gives the Court pause is the dislocated elbow Jackson suffered as a result of the arrest. The D.C. Circuit has explained that the severity of an injury itself is not a basis for deciding whether the force used was excessive, but rather represents one of many factors to consider. *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993) (describing an injury as "a relevant factor under a 'test of reasonableness'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979))); *see also Oberwetter*, 639 F.3d at 555–56 (explaining that the fact that the officer did not cause plaintiff any serious bodily injury "tends to confirm that the use of force was not excessive"). Other courts have declined to find excessive force arising solely from the fact of injury during an arrest. *See, e.g.*, *Jackson v. District of Columbia*, 83 F. Supp. 3d 158, 171 (D.D.C. 2015) (considering plaintiff's arm that "was broken as a result of the force used by the officers"). The Court finds no precedent from the Supreme Court or the D.C. Circuit clearly establishing that a dislocation or similar injury during arrest of a resisting individual renders the officer liable for excessive force. Indeed, the D.C. Circuit affirmed the grant of qualified immunity in *Hedgpeth* where the takedown maneuver caused the plaintiff to strike his head on a window, after which he suffered injuries including a concussion, headaches, and vertigo. 893 F.3d at 805. The injuries in *Hedgpeth* were much more severe than those Jackson suffered on May 8. *See id.*; Compl. ¶¶ 18–19. If the D.C. Circuit found qualified immunity warranted in that case, then it is appropriate here.

The Court concludes that no precedent existed in May 2018 clearly establishing a resisting arrestee's right not to be forced into handcuffs. Indeed, the precedent that existed at the time pointed toward the constitutionality of Officer Lombardini's actions in this case. The Court

again cannot "identify a case where an officer acting under similar circumstances as" Officer Lombardini "was held to have violated the" plaintiff's constitutional rights. *White*, 580 U.S. at 79. Furthermore, no binding precedent indicated that an officer uses excessive force when the resisting arrestee's arm suffers a dislocation or similar injury as a result of the officer's efforts to place him in handcuffs. As a result, Officer Lombardini is entitled to qualified immunity for his use of force to arrest Jackson on May 2018.

## V.  CONCLUSION

For the foregoing reasons, Defendant Officer Glenn Lombardini's Motion for Summary Judgment (ECF No. 45) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 11, 2024                                   RUDOLPH CONTRERAS
                                                             United States District Judge